# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

THOMAS MCFEELY,

        Plaintiff,

v.                                                   Case No. 13-C-832

CAROLYN COLVIN,

        Defendant.

## DECISION AND ORDER

Plaintiff Thomas McFeely brings this action challenging the decision of the Commissioner of Social Security denying his disability benefits. For the reasons given herein, the decision will be affirmed.

**I. Background**

Plaintiff has been diagnosed with a congenital brain malformation called closed lip schizencephaly. (Tr. 658.) This has resulted in seizures that cause him to shake and sometimes lose consciousness. He also struggles with anxiety disorder and substance abuse, including alcohol, cannabis and methamphetamine, which has resulted in him being terminated from several alcohol and drug treatment programs. For several months in 2008 and 2009 Plaintiff was incarcerated after being convicted of burglary, theft and operation of a motor vehicle without consent.

The ALJ denied benefits. In doing so, the ALJ discounted the plaintiff's credibility for several reasons. Plaintiff had often given conflicting histories of his medical condition, with one

doctor noting that he had been "very evasive" when asked about drug and alcohol problems. (Tr. 582.) (That doctor declined to take him on as a patient due to his lack of straightforwardness.) In addition, Plaintiff had told various physicians that he stopped taking his medications because he didn't think he needed them or they weren't effective. A psychologist also noted that he was not forthright and open about presenting his information. (Tr. 616.) In short, the ALJ found little in the record to corroborate the plaintiff's testimony that his seizures were debilitating and that he experienced auras every day.

The crux of the case was the opinion of Plaintiff's neurologist, who concluded that Plaintiff was disabled. The ALJ gave little weight to the neurologist's opinion on the grounds that the neurologist was unaware of Plaintiff's continued alcohol use and his failure to use his anti-seizure medications. Instead, the ALJ gave greater weight to the opinions of two state agency medical consultants.

**II. Analysis**

An ALJ's opinion will be upheld if it is supported by substantial evidence, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *McKinzey v. Astrue,* 641 F.3d 884, 889 (7th Cir. 2011). The reviewing court does not reweigh evidence but merely determines whether the ALJ has built a "logical bridge" from the evidence to the conclusion. *Young v. Barnhart,* 362 F.3d 995, 1002 (7th Cir. 2004).

**A. Opinion of Dr. Seeger**

Plaintiff first argues that the ALJ failed to give proper weight to the opinion of Dr. Seeger, Plaintiff's treating neurologist. Dr. Seeger wrote a "to whom it may concern" letter in February

2

2012 indicating that Plaintiff has intractable epilepsy caused by a congenital brain malformation. (Tr. 655.) (The record suggests the cause might have been head trauma. (Tr. 90.)) The epilepsy "has not responded to essentially all currently available anti-epileptic medications. The expectation is that his epilepsy will remain intractable." (*Id.*) "Therefore, we consider Mr. McFeely disabled from a neurological standpoint due to the frequency and unpredictable nature of these seizures." (*Id.*)

The ALJ gave "limited weight" to Dr. Seeger's opinion. (Tr. 20.) The ALJ noted that Dr. Seeger had seen Plaintiff only infrequently over the years and was "apparently not aware of his non-compliance in terms of both his medication and his continued use of alcohol." (*Id.*) Plaintiff argues that the ALJ's conclusion impermissibly substitutes her own judgment for that of the treating neurologist.

An ALJ "may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability." *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir.2007) (internal quotations marks and citation omitted).

The record supports the ALJ's view. If the neurologist did not know about Plaintiff's alcohol use, that would undoubtedly have affected her conclusion that his seizures were intractable. State agency physician Ronald Shaw, M.D. noted that although a neurological evaluation showed his seizures to be intractable, the claimant "was not providing accurate info to the neurologist regarding his etoh [ethanol, i.e., alcohol] use. Clmt has also not taken many of the meds he was prscd as he was instructed to." (Tr. 624.) Dr. Shaw thus concluded that Plaintiff's statements

3

regarding his seizures were "not credible." (*Id.*) The ALJ cited this opinion in reaching her decision. Similarly, state agency consultant Dr. Pat Chan concluded that Plaintiff's control of seizures "is hampered by noncompliance with prescribed medication at times and ongoing alcohol abuse." (Tr. 471.) The ALJ also cited Dr. Chan's opinion favorably.

The record demonstrates significant alcohol-related experiences, as well as deceit about those experiences. For example, Plaintiff was admitted to the hospital after a seizure on March 23, 2010, and he reported that he had hit his head the previous night after drinking significant amounts of alcohol. He reported to the emergency room doctor that "he thought that this was related to the seizure also." (Tr. 548.) Had the neurologist known of such information, her opinion might well have been different, because alcohol use was partly to blame for at least some of his seizures. Instead, she had been told in January 2010 that he had been "sober for a long time, but had some alcohol use when he was younger." (Tr. 517.) Yet only weeks earlier, Plaintiff had been admitted to the ER for clearance to be taken to jail. At that time, he reported drinking 10 shots of vodka three to four times per week. (Tr. 448.) And two months after Dr. Seeger said Plaintiff was "sober for a long time," he was admitted to the ER as a result of hitting his head after drinking. (Tr. 548.) Thus, it was clear in 2010 that Plaintiff was consuming large amounts of alcohol and that Dr. Seeger had not been provided the truth about Plaintiff's drinking habits. Similarly, around the same time Plaintiff sought treatment from Dr. Steinke, who ultimately refused to take him on as a patient. Dr. Steinke's January 2010 treatment notes reveal anger after his own investigation revealed that Plaintiff had been admitted to the ER only weeks earlier "inebriated and [he] was very abusive to the nurses and acted very inappropriately with the nurses." (Tr. 582.) Given this history, the ALJ

was correct to discount the opinion of Dr. Seeger because it was based on an incomplete and arguably misleading medical history.

Alcohol use was critical not just in the onset of Plaintiff's seizures but also in its effect on antiseizure medication. During the hearing the ALJ asked whether "Dr. Seeger has told you that drinking is absolutely a no-no with seizure medication, right? . . . And it totally interferes with the seizure control when you try and drink with seizure medication, correct?" (Tr. 96.) Plaintiff agreed with both statements. (*Id.*) Given that Dr. Seeger was under a misapprehension about Plaintiff's drinking habits, the ALJ correctly discounted her opinion that the plaintiff's epilepsy was resistant to medication.

Just as importantly, the ALJ properly concluded that Plaintiff's history of not taking his medications was an important factor that warranted discounting the neurologist's opinion, just as Drs. Chan and Shaw had concluded. The record contains several instances of Plaintiff not taking medication properly. In November 2009 he reported that he stopped taking his seizure medications two months earlier because he thought they were a "waste of money." (Tr. 449.) This statement could be interpreted a number of ways. It could mean that he believed the medication was not helping him at all. It could mean that his symptoms and the frequency of his seizures were not serious enough to justify the expense of the medication. It could also mean that he simply prioritized other expenditures over his medication. In the course of a single medical record, there is conflicting evidence about why he was not taking his medications. On January 22, 2010, Plaintiff visited Dr. Steinke, who noted that Plaintiff reported stopping his medications "because he just did not need them." (Tr. 581.) Dr. Steinke also referred to notes from another provider, who had reported that Plaintiff said the medication "cost[s] money and he just did not want to buy them."

5

(*Id.*) Dr. Steinke was "suspicious" of Plaintiff's motives in seeking an appointment with him. He asked the plaintiff why he was "jumping around between doctors so much," and why he spent money on cigarettes when he said he cannot afford to buy his medications. (Tr. 584.) Thus within a single medical record there is a strong suggestion that the plaintiff was giving numerous reasons why he was not taking his seizure (and other) medications—he could not afford them, he did not want to buy them, and he did not need them. Regardless, what was clear is that he did not have an established pattern for taking his medication as directed.

On March 23, 2010 Plaintiff was admitted to the ER after a seizure. The admitting physician noted that Plaintiff had been prescribed gabapentin and clonazapam, but that Plaintiff had run out of clonazapam [Klonopin] and did not recall whether he had taken his gabapentin the day prior to the seizure. (Tr. 548.) The treatment provided, after consultation with a neurologist, was to administer gabapentin and anticonvulsant drugs and have Plaintiff admitted to the hospital for observation. Plaintiff declined admission to the hospital and the doctor noted that he "seemed to understand that he was taking risks with his life and longevity" by refusing admission to the hospital. (Tr. 549.)

This ER record shows at least three things. First, it demonstrates that medication was part of the prescribed treatment for his condition, because doctors administered gabapentin and recommended further anticonvulsives. In other words, the epilepsy was not considered intractable at this time. Second, as the ALJ noted, it demonstrates that Plaintiff was not taking his prescribed medication. Third, it demonstrates Plaintiff's decision to reject the medical advice of treating physicians. All of these facts undermine his credibility about the severity of his symptoms (as the ALJ concluded) and further undermine Dr. Seeger's opinion. In short, had Dr. Seeger known that

6

Plaintiff was simply not taking his antiseizure medications with any consistency, it is doubtful that she would have concluded his seizures were resistant to medication. Plaintiff was not taking his medication the day prior to admission to the hospital, and the next day he had a seizure.[1] Whether there was a cause and effect with the medication, or whether (as Plaintiff believed) hitting his head as a result of drinking alcohol was a cause of the seizure, both factors are material and yet were not incorporated in Dr. Seeger's opinion.

Plaintiff's condition was apparently not one that, by its very nature, would necessarily have been intractable. Instead, it appears his doctors reached that conclusion only after anti-seizure medications did not have the hoped-for effect. Thus, had Dr. Seeger known he was not even taking his medications properly, she likely would not have concluded that his seizures were resistant to medication. That conclusion, of course, was the foundation of her view that he was disabled. (Tr. 655.) The ALJ properly discounted her opinion for those reasons.

**B. The Listings**

Plaintiff also argues that the ALJ failed to properly consider whether his combination of impairments equaled the listings. In particular, the plaintiff appears to argue that the ALJ should have credited the opinion of state consulting psychologist Dr. Edelman. Dr. Edelman completed

---

[1] At a minimum, he did not take Klonopin and did not remember whether he took gabapentin. Asking someone whether he took his medication the previous day is akin to asking someone whether he remembers stopping at a stop sign a day earlier. If the person habitually stops at stop signs, he will have no trouble answering in the affirmative even though he might not remember the specific stop in question. Here, the fact that Plaintiff did not remember if he took his gabapentin strongly suggests that he did *not* take his medication. Prescription drugs are generally taken out of habit as part of a routine, and thus if someone does not remember taking the drug it is likely that taking that drug was not part of his routine.

7

both a Psychiatric Review Technique (PRT) and a Mental Residual Functional Capacity Assessment (MRFC). These forms are used by the SSA consultants to evaluate mental impairments in accordance with the "special technique" prescribed in 20 C.F.R. § 404.1520a.

The detailed instructions governing the use of these forms are set forth in the SSA's Program Operations Manual System ("POMS"), which is available at https://secure.ssa.gov/apps10/poms.nsf. *See* DI 24505.025 and DI 24510.060. This court has previously described the special technique in detail, *see Bloomer v. Colvin*, Case No. 12-C-1275, 2013 WL 5539412, \*\*4-7 (E.D. Wis. Oct. 8, 2013) (unpublished), and will not repeat that discussion here. To meet a listing requires that the claimant's mental impairments result in at least two of the following problems: (1) marked restriction in activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, and pace; or (4) repeated episodes of decompensation. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02B, 12.04B, 12.06B (commonly known as "the B criteria"). *Sims v. Barnhart,* 309 F.3d 424, 431 (7th Cir. 2002). The ALJ found that Plaintiff's mental impairments (e.g., anxiety, moderate restrictions in social functioning, etc.) were not equivalent to a listing because there was no evidence he had marked restrictions in significant areas of social functioning; persistence, concentration and pace; activities of daily living; and he had no repeated episodes of decompensation. (Tr. 17.) These areas were considered in combination, not in isolation.

Dr. Edelman's report, upon which Plaintiff places most of his reliance, would not support a finding of disability under a listing. In his rating of functional limitations, Dr. Edelman found only moderate restrictions of daily living activities, maintaining social functioning and concentration,

8

persistence or pace. There were no periods of decompensation. (Tr. 637.) These are the "Paragraph B" criteria that the ALJ actually considered, and they do not equal a listing. Thus, even based on the PRT completed by Dr. Edelman, Plaintiff did not meet a listing. (Tr. 627.)

Plaintiff points to the MRFC completed by Dr. Edelman in which he checked the box in Section I, the "Summary Conclusion" section of the form, indicating he was "markedly limited" in "the ability to interact appropriately with the general public." (Tr. 642.) But Section I is not considered part of the RFC. According to the POMS, "Section I is merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment." POMS DI 24510.060 (bold original); *see also Smith v. Commissioner of Social Sec.*, 631 F.3d 632, 637 (3d Cir. 2010) ( "Because Smith cannot rely on the worksheet component of the Mental Residual Functional Capacity Assessment to contend that the hypothetical question was deficient, his argument is without merit as it pertains to Dr. Tan and Dr. Graff."). Moreover, the ALJ gave "limited weight" to the reports completed by Dr. Edelman because he found that Plaintiff had moderate limitations in activities of daily living whereas the ALJ concluded the evidence showed only minimal restrictions in that area." (Tr. 22.)

Finally, Dr. Edelman, like other medical providers, found Plaintiff "vague, evasive & providing conflicting information." (Tr. 642.) It was clear that Dr. Edelman was unimpressed by Plaintiff's mental health issues. Even if one considers the worksheet he completed, Dr. Edelman found him to have essentially normal or only moderately limited abilities in 19 out of 20 categories on the worksheet, and noted Plaintiff did not have any anxiety symptoms during the interview. (Tr. 643.) The only marked difficulty was an inability to interact with the general public. Thousands

of jobs exist that do not require interaction with the general public, and so the ALJ reasonably found plenty of jobs the plaintiff could perform even after incorporating this limitation into the residual functional capacity. Plaintiff has not cited any cases in which someone with such commonplace mental health issues was found to have met a listing. Ultimately, Plaintiff's mental health issues involve a relatively standard personality disorder and issues with anxiety—the kinds of issues that are seen in countless claimants, not to mention tens of millions of other Americans. Although these factors are typically given consideration in determining a residual functional capacity, it is unclear why this Plaintiff believes his mental health issues would rise to the level of meeting a listing for disability. In short, the ALJ properly considered the evidence and reached a sound conclusion.

## C. Developing the Record

Plaintiff also argues that the ALJ erred by failing to adequately consider the seizure questionnaires submitted by Plaintiff's mother and other relatives. He argues that if the ALJ found them less than fully credible, the ALJ should have independently sought additional medical information or sent Plaintiff to a neurologist consultant.

During the hearing, the ALJ found it "stunning" that the plaintiff himself did not keep any kind of records on his seizure history. (Tr. 98.) Plaintiff's family members submitted reports attempting to document his condition, but the ALJ discounted these given their relationship with the plaintiff. (Tr. 22.) The ALJ's conclusion of no disability was largely based on the plaintiff's alcohol use and noncompliance with medication, which I have addressed above. Given those findings, the observations of family members would not be material because they would not support the notion that Plaintiff's condition was intractable. Put another way, there is little evidence in the

10

record that Plaintiff's condition could not be controlled or ameliorated if he avoided alcohol and took his medication as directed. No further development of the record would have changed that conclusion.

**D. Other Evidence**

Plaintiff has filed, along with his reply brief, treatment notes provided by a neuropsychologist on February 25, 2013 (after the ALJ's decision). (ECF. No. 18-1.) Dr. William Hitch, Ph.D. conducted a neuropsychological exam on Plaintiff and noted issues of attention and concentration, as well as depression and anxiety. These concerns were magnified by the issue of Plaintiff's seizures.

District courts have the ability to remand based on new evidence where "there is new evidence which is material and [ ] there is good cause for the failure to incorporate such evidence into the record in a prior proceeding," 42 U.S.C. § 405(g). But here the evidence speaks to the plaintiff's post-hearing condition rather than his condition prior to the ALJ's decision. Individuals with medical problems frequently and routinely have changes in their conditions over time. If new evidence such as this justified a remand, then remands would become the norm given the frequency with which patients have occasion to have new tests or meet with new doctors. That is not what the law requires. *Getch v. Astrue,* 539 F.3d 473, 484 (7th Cir. 2008) ("None of the new evidence proffered by Mr. Getch speaks to his condition at the relevant time period; it pertains only to his allegedly worsening condition in 2004 and 2005—well after the ALJ rendered his decision.") Accordingly, I conclude the recently-filed opinion of Dr. Hitch is immaterial to the benefits determination.

11

**III. Conclusion**

For the reasons given above, the decision of the Commissioner is affirmed.

**SO ORDERED** this   27th   day of June, 2014.

                                         s/ William C. Griesbach
                                         William C. Griesbach, Chief Judge
                                         United States District Court